IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LEONARD CONTRERAS SANDOVAL,

        Petitioner,

    v.

BRAD CAIN,

        Respondent.

Case No. 2:19-cv-01278-SI

OPINION AND ORDER

Susan F. Wilk
Assistant Federal Public Defender
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204

    Attorney for Petitioner

Ellen F. Rosenblum, Attorney General
James M. Aaron, Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, Oregon 97310

    Attorneys for Respondent

1 – OPINION AND ORDER

SIMON, District Judge.

Petitioner brings this habeas corpus case pursuant to 28 U.S.C. § 2254 challenging the legality of his Josephine County murder conviction dated March 6, 2009. For the reasons that follow, the Amended Petition for Writ of Habeas Corpus (#23) is denied.

## BACKGROUND

Petitioner and Jack Whitcraft, two residents of a small town in Josephine County, had an acrimonious relationship. While Petitioner and his wife, Mary Carlson, were separated but still married, she became engaged in a romantic relationship with Whitcraft and married him after she and Petitioner divorced. Thereafter, Petitioner was "forever" harassing and threatening Carlson and Whitcraft, and had specifically told Carlson, "If I can't have you, no one can." Trial Transcript, pp. 1033, 1035.[1] He threatened to kill her, Whitcraft and anyone who was helping her. *Id* at 1035. At times, Carlson would be walking down the street while Petitioner was driving down the same street. He would swerve his vehicle close to her, reach out, and hit whatever she was carrying in her hand. *Id* at 1037.

After his divorce from Carlson, Petitioner entered into a relationship with Robin Garten for approximately three years in the late 1990's. He then began a relationship with another woman, Janice Rose. Rose's mother lived two houses away from the home Carlson and Whitcraft occupied, placing these four other individuals within frequent proximity to each other. Petitioner and Rose were "both tearing in and out of the road all the time and making gestures at [Carlson]." *Id*. Petitioner would gesticulate, "[u]sually the middle finger," and this would occur "[t]here, four, five times a week, every time [Petitioner] came in." *Id*.

---

[1] Citations to the trial transcript are to the numbers located at the bottom right of the pages.

Despite the fact that Carlson had obtained a restraining order against Petitioner after he attempted to hit her with his truck while she was standing in her yard, the confrontations escalated in late 2000 and 2001. Petitioner would stalk Carlson and "pretty much didn't let [her] go anyplace freely." *Id* at 1039. Petitioner also demonstrated consistent animosity toward Whitcraft and, on one occasion, attempted to run him off the road after Whitcraft exited a gas station. *Id* at 1039. Whitcraft told Carlson that "one of these times [Petitioner is] actually going to get [Whitcraft] run off the road and [Whitcraft's] afraid that one of these times that the [Petitioner] is going to pull a gun and shoot him when he's . . . driving." *Id* at 1041.

Tensions between Petitioner and Whitcraft continued to run high, and at least one person heard Whitcraft say he would like to kill Petitioner. *Id* at 1473. On July 18, 2001, Whitcraft and Petitioner were both at the Lil Pantry convenience store when they became involved in a physical altercation. It is not known who instigated the fight and, while Whitcraft was bloody, his glasses were broken, and his shirt had been ripped off, it is uncontroverted that he prevailed in the fight. *Id* at 1041. In the aftermath of that altercation, "it seemed like [Petitioner's] attitude had changed . . . he was more anxious and more angry." *Id* at 1089. According to Rose, "he wasn't the person that I had known. He was very angry, he was very nervous, he couldn't stay in one sport very long, very agitated." *Id*.

For his part, in the wake of the fight at the Lil Pantry, Whitcraft feared that "because he had finally got the better of [Petitioner] that [Petitioner] would retaliate and probably shoot him." *Id* at 1041. Approximately eight weeks after the altercation, on September 13, 2001, Whitcraft called Carlson at home:

> He was very agitated, very scared, his voice was very shaky, said he had just talked to the Police Department – or, the Sheriff's Department and told me why.

3 – OPINION AND ORDER

> * * *
>
> . . . the [Petitioner] had caught him at the red light at the Robertson Bridge Road and pulled a gun on him and then followed him up to Harvey's when he went in there, but didn't follow him in and he was just afraid that he'd come back and shoot him.
>
> * * *
>
> . . . he told me to watch out because now he's done this and [Petitioner will] probably come for me next.

*Id.*²

Whitcraft and Carlson discussed the incident at length and agreed that Whitcraft should start carrying a revolver with him when he left the house.³ Carslon gave him a .44-caliber revolver Petitioner had given her as a present on Valentine's Day 1984, and Whitcraft kept it on the seat next to him when he drove, except when Carlson was with him in which case he kept it on the dashboard of his vehicle.

Two weeks later, on September 27, 2001, Whitcraft was driving on Pickett Creek Road outside of Merlin, Oregon when Petitioner shot and killed him. There were no witnesses to the shooting. The evidence showed that Whitcraft had slammed the brakes on his pickup truck in an uncontrolled stop. When law enforcement showed up at the scene, the back of Whitcraft's truck was in contact with the front of Petitioner's Ford Bronco, and there was damage to the left front quarter panel of the Bronco. Whitcraft's truck was still running and the gear selector was in neutral while the Bronco was not running and the gear selector was in third gear.⁴ The driver's

---

² It is unclear when, but there was also an incident where Petitioner pointed a pistol at Carlson from the driver's side of his car as Carlson was driving in her own vehicle. Trial Transcript, p. 1043.

³ Prior to the incident where Petitioner pointed the firearm at Whitcraft, Whitcraft did not regularly carry a firearm. Trial Transcript, p. 1043.

⁴ Petitioner told police that when he left the scene to call 9-1-1, Whitcraft's truck was still running with the gear selector in reverse. Respondent's Exhibit 134, p. 39.

side door of Whitcraft's truck was open, and his body lay partially in the roadway with his feet still tangled up in the interior speaker wiring of his truck's cabin. His .44-caliber revolver was cocked, loaded, and underneath his body. Petitioner had fired a single shot from his bolt-action rifle which pierced the rear window of Whitcraft's pickup, entered the rear of his skull on the lower left side, and exited above his right eye. Responding officers found an ejected single rifle shell casing outside and underneath the Bronco. Trial Transcript, pp. 1315-17.

Approximately 90 minutes after the shooting, Detective Rylander interviewed Petitioner. He claimed he had killed Whitcraft in self-defense. According to Petitioner's version of events, he was on his way to visit with Tyrone Montgomery, a service officer for Veterans Affairs, about increasing his benefits. He then planned to deliver grass seed to a friend who wanted to seed a muddy portion of his yard.[5] He was at a stop sign on a road running perpendicular to Pickett Creek Road when he saw Whitcraft drive by in front of him. Petitioner claimed that when he turned right onto Pickett Creek Road (placing him behind Whitcraft), Whitcraft slammed on his brakes, reversed the vehicle, and intentionally crashed into the front of Petitioner's Ford Bronco.

Petitioner related that after the collision, he peered through the rear window of Whitcraft's pickup truck and saw him reach over and grab a revolver. Whitcraft then allegedly opened the door of his truck, stepped out with one leg, and began turning toward Petitioner such that he was facing Petitioner and pointing the revolver at him. Respondent's Exhibit 134, pp. 29-33. Petitioner stated that he retrieved his rifle from behind his seat, chambered a round from the loaded magazine, opened the door of his Bronco, and fired without aiming while still seated in the vehicle. *Id* at 33-36. Despite killing Whitcraft with a single, well-placed shot, Petitioner

---

[5] Petitioner did not have any grass seed in his car that day. Trial Transcript, p. 785.

5 – OPINION AND ORDER

stated that he not only lacked the time to look through his rifle's scope, but also did not have time to look down the barrel before firing what he claimed was simply a lucky shot. *Id* at 37.

Approximately 80 minutes after Petitioner participated in this interview, he changed his recollection of events. At the time, he was riding in a vehicle with Rylander who was not questioning him. Petitioner initiated a new conversation where he advised Rylander that, contrary to his earlier statement during his interview, Whitcraft had never actually exited his vehicle but was instead preparing to do so.

The Josephine County Grand jury indicted Petitioner on one count of murder with a firearm. He proceeded to a jury trial where the State highlighted how certain discrepancies in Petitioner's recollection of events was inconsistent with the physical evidence at the scene. For instance, Because Whitcraft had both of his feet tangled in his car's interior wiring, he could not have stepped out of the vehicle as Petitioner initially told police. *Id* at 1212, 1214.

In addition, based upon the position of the vehicles and trajectory of the bullet, the physical evidence suggested that Whitcraft had either been in the normal driving position with his head facing forward, or possibly turning his head slightly and starting to make a movement to grab the door. He had not, however, made any significant movement to exit the vehicle when Petitioner shot him. *Id* at 1234-38, 1238, 1257, 1315-17, 1321-22. Contrary to Petitioner's initial statements to Rylander, Whitcraft had not been exiting his car, facing Petitioner with his gun drawn at the time Petitioner killed him. This was important not only because Petitioner stated that he had been in his Bronco, under attack, when he fired his weapon, but also because his neighbors testified that they frequently witnessed him practice a shooting maneuver where he would drive his car at a high rate of speed, abruptly stop the vehicle, jump out, and shoot his firearm. *Id* at 1416, 1424, 1428.

Testimony at trial also revealed Petitioner's fixation with Whitcraft and Carlson. Rose testified at trial that Petitioner "had a real hatred for Mary" and she "could see the anger in him building." *Id* at 1085. She recalled riding with Petitioner on one occasion when he glimpsed Whitcraft driving. "[H]e was getting real close to the bumper, getting very aggressive." *Id* at 1087. According to Rose, Whitcraft "got so scared that he pulled over into the oncoming lane and [Petitioner] just hit the gas and got side-by-side' with him and they were flipping each other off." *Id.* On another occasion, they were out driving when Petitioner saw Whitcraft and Carlson driving, and "he'd just get real close to the bumper and start cussing. . . and acting very angry and volatile." *Id.* Rose screamed at Petitioner to stop and leave the couple alone. Petitioner did not explain to her why he was engaging in such aggressive behavior, "he was just angry, just a rage." *Id*. These actions were consistent with a scheme he related to Rose shortly before he killed Whitcraft. He told her, "'Mary has a gun in her car at all times so if they come out of the car with a gun from the car I'll shoot them, it'll be self-defense.'" *Id.*

Garten testified that during her time dating Petitioner, he talked about Whitcraft and Carlson "constantly," that he "always had something bad to say about them," and told her he was going to kill Whitcraft and Carlson and "make a blood bath out of it." *Id* at 1123. She recalled that Petitioner tried to intimidate Carlson both in town and where she lived, and that he frequently talked about killing Carlson and Whitcraft. *Id* at 1125.

Gary Sell, another local resident, testified about the first occasion he met Petitioner. A third party introduced him to Petitioner, stating that Sell was a friend of Whitcraft's. According to Sell, "the first thing that comes out of [Petitioner's] mouth is he's going to shoot [Whitcraft] and fill him full of lead." *Id* at 781. Sell stated "it wasn't joking. Yeah, it was serious." *Id*.

The jury convicted Petitioner of intentional murder with a firearm and the trial court sentenced him to life in prison with a 300-month minimum sentence. The Oregon Court of Appeals affirmed the trial court's decision without issuing a written opinion, *State v. Sandoval*, 204 Or. App. 457, 130 P.3d 808 (2006), but the Oregon Supreme Court granted review, reversed the conviction, and remanded the case for a new trial based upon an erroneous jury instruction. 342 Or. 506, 156 P.3d 60 (2007).

In 2009, the State retried Petitioner. Once again, a jury convicted him of intentional murder with a firearm and the trial judge sentenced him to life in prison with a 300-month minimum. The Oregon Court of Appeals affirmed the conviction without opinion, and the Oregon Supreme Court denied review. *State v. Sandoval*, 246 Or. App. 577, 266 P.3d 669 (2011), *rev. denied,* 351 Or. 649, 275 P.3d 968 (2012).

Petitioner next filed for post-conviction relief ("PCR") in Malheur County. Among the many claims he raised, he asserted that his attorney from his 2009 trial had been ineffective for failing to: (1) investigate Petitioner's military and Veterans' Administration records; (2) retain an expert in self-defense and use of force; and (3) retain an expert in military training and combat who could have provided evidence about how Petitioner's killing of Whitcraft might have been a conditioned response. Respondent's Exhibit 123. The PCR court concluded that trial counsel performed deficiently when he did not obtain Petitioner's military records and consult self-defense and use-of-force experts. Respondent's Exhibit 170, p. 211. Noting that this was a very difficult case, the PCR court did not, however, find that Petitioner had established prejudice. The Oregon Court of Appeals affirmed the PCR court's decision without opinion, and the Oregon Supreme Court denied review. *Sandoval v. Nooth,* 294 Or. App. 511, 429 P.3d 448 (2018), *rev. denied,* 364 Or. 535, 437 P.3d 1139 (2019).

Petitioner filed this federal habeas corpus action on August 14, 2019, and the Court appointed counsel to represent him. On April 6, 2020, Petitioner filed his Amended Petition for Writ of Habeas Corpus (#23) wherein he raises four grounds for relief containing numerous sub-parts. Respondent asks the Court to deny relief on the Amended Petition because: (1) with the exception of Grounds I, III(A), III(B)(b), and III (B)(d), Petitioner failed to fairly present his claims to Oregon's state courts and they are now procedurally defaulted; and (2) Oregon's state courts denied relief on Petitioner's fairly presented claims in decisions that are reasonable and entitled to deference.

## DISCUSSION

**I.    Unargued Claims**

In his briefing, Petitioner argues that: (1) the trial court violated his right to due process when it admitted evidence that was irrelevant and prejudicial (Ground I); and (2) trial counsel was ineffective for failing to obtain his military records and consult experts on use of force, self-defense, combat, and military training (Grounds III(A), III(B)(b), and III(B)(d)). He does not, however, address Respondent's contention that the remainder of his claims are procedurally defaulted and ineligible for federal habeas corpus review. Where Petitioner has not addressed this procedural issue, he has not carried his burden of proof with respect to these unargued claims. *See Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (Petitioner bears the burden of proving his claims). Even if Petitioner had briefed the procedural issue, the Court has examined the unargued claims based upon the existing record and determined that they do not entitle him to relief.

///

///

## II.     Standard of Review

Review in this case is governed by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") of 1996. An application for a writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant relief "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id* at 413. The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. *Id* at 410. Twenty-eight U.S.C. § 2254(d) "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no farther." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Twenty-eight U.S.C. § 2254(d)(2) allows a petitioner to "challenge the substance of the state court's findings and attempt to show that those findings were not supported by substantial evidence in the state court record." *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012). A

state court renders an unreasonable determination of the facts if it "plainly misapprehends or misstates the record in making its findings or where the state court has before it, yet apparently ignores, evidence that supports petitioner's claim." *Andrew v. Davis,* 944 F.3d 1092, 1107 (9th Cir. 2019) (internal quotations omitted). A federal habeas court cannot overturn a state court decision on factual grounds "unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003). This is a "'daunting standard—one that will be satisfied in relatively few cases,' especially because we must be 'particularly deferential to our state-court colleagues.'" *Hernandez v. Holland,* 750 F.3d 843, 857 (9th Cir. 2014) (quoting *Taylor v. Maddox,* 366 F.3d 992, 1000 (9th Cir. 2004)).

When a state court reaches a decision on the merits but provides no reasoning to support its conclusion, the federal habeas court must conduct an independent review of the record to determine whether the state court clearly erred in its application of Supreme Court law. *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). In such an instance, although the federal court independently reviews the record, it still lends deference to the state court's ultimate decision and will only grant habeas relief if the state court's decision was objectively unreasonable. *Richter,* 562 U.S. at 98; *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

### III.     Ground One: Due Process

As Ground One, Petitioner alleges that the trial court improperly admitted testimony from Michelle Clayburn, a neighbor who lived between Carlson and Rose. He claims that that the trial court erroneously overruled objections to her testimony that he: (1) sat in Rose's yard sharpening knives; (2) carried firearms from his house to his vehicle; (3) intimidated Clayburn; (4) allowed his pit bulls charged the fence at Clayburn's children; and (5) threatened both Rose and Clayburn. Because the Oregon Court of Appeals did not provide any rationale for its affirmance

of the trial court's decision, this Court conducts an independent review of the record with respect to this claim.

Petitioner asserts that the trial court's evidentiary rulings as to Clayburn's testimony are contrary to clearly established federal law. However, in 2009, the Ninth Circuit addressed whether due process claims of this nature can qualify for habeas corpus relief and concluded that they cannot:

> Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by "clearly established Federal law," as laid out by the Supreme Court. In cases where the Supreme Court has not adequately addressed a claim, this court cannot use its own precedent to find a state court ruling unreasonable.
>
> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an unreasonable application." Under the strict standards of AEDPA, we are therefore without power to issue the writ on the basis of [the petitioner's] additional claims.

*Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (internal citations omitted).[6]

Petitioner argues that clearly established federal law exists that would permit this Court to grant habeas corpus relief. He directs the Court to *Dowling v. United States*, 493 U.S. 342, 353 (1990), where the Supreme Court concluded that improper admission of unduly prejudicial evidence of other bad acts may violate due process. He also points out that in *McKinney v. Rees*,

---

[6] The Ninth Circuit concluded that, but for the "clearly established federal law" restriction applicable to habeas corpus cases, it would have granted relief because the admission of irrelevant and prejudicial evidence in *Holley* "resulted in a trial that was fundamentally unfair and would warrant issuance of the writ under [the Ninth Circuit's] precedent." *Holley*, 568 F.3d at 1101 n.2.

12 – OPINION AND ORDER

993 F.2d 1378 (9th Cir. 1993), the Ninth Circuit stated that the use of "other acts" evidence as character evidence is "contrary to firmly established principles of Anglo-American jurisprudence." *Id* at 1380.

Both of these cases predate the AEDPA as well as the Ninth Circuit's decision in *Holley* wherein the appellate court had occasion to conclude that there is no clearly established federal law governing due process claims arising out of state evidentiary rulings. No subsequent en banc opinion by the Ninth Circuit has overruled *Holley*, and Petitioner points to no clearly established federal law the Supreme Court issued in the years following *Holley* that would provide a basis for habeas corpus relief. Where precedent establishes that there is no clearly established federal law on point as to Petitioner's due process claim, he is not entitled to relief.

### IV.    Ground III: Ineffective Assistance of Counsel

As Ground Three, Petitioner argues three fairly presented claims of ineffective assistance of counsel. He asserts that his trial attorney neglected to obtain his military records (Ground III(A)), consult with and retain an expert in self-defense and use of force (Ground III(B)(b)), and consult with and retain an expert in military training and combat (Ground III(B)(d)). The Court uses the general two-part test established by the Supreme Court to determine whether Petitioner received ineffective assistance of counsel. *Knowles v. Mirzayance*, 556 U.S. 111, 122-23 (2009).

First, Petitioner must show that his counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984). Due to the difficulties in evaluating counsel's performance, courts must indulge a strong presumption that the conduct falls within the "wide range of reasonable professional assistance." *Id* at 689. Second, Petitioner must show that his counsel's performance prejudiced the defense. The appropriate test for prejudice is whether Petitioner can show "that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id* at 694. A reasonable probability is one which is sufficient to undermine confidence in the outcome of the trial. *Id* at 696. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. 86, 112 (2011) (citing *Strickland,* 466 U.S. at 693). When *Strickland's* general standard is combined with the standard of review governing 28 U.S.C. § 2254 habeas corpus cases, the result is a "doubly deferential judicial review." *Mirzayance*, 556 U.S. at 122.

After personally reviewing "90 percent" of the trial transcript, the PCR judge determined that although counsel's performance fell below an objective standard of reasonableness for failing to obtain Petitioner's military records and consult with defense and use-of-force experts, Petitioner had not established prejudice.

> But my goodness, you know he's a military veteran, I think you need to get the records. I think you need to at least consider and at least speak to a self-defense expert and a use-of-force expert.
>
> * * *
>
> . . . when you look at is his performance deficient, in those two areas, not hiring – and you don't want to (indiscernible) jury with eight experts, but in hiring one or two or at least consulting with them (indiscernible) use-of-force and self-defense and in conjunction with getting the military records and providing those to the experts, I find (trial counsel) was deficient.
>
> * * *
>
> The problem . . . in [Petitioner's] case is finding adequate prejudice to [Petitioner]. In that I have to look at all of the evidence that was presented.
>
> * * *
>
> The evidence is extremely strong, circumstantial or not, that this was a setup – albeit, a really creative and unusual setup. And

> maybe if Mr. Whitcraft, the victim, hadn't acted in the way he did everybody would have driven off and something would have happened, possibly happened a week later, who knows.
>
> But the fact of the matter is there is enough evidence for the jury in this case, even hearing the experts that I've said I believe should have been called or at least consulted, that I don't – I cannot find as a matter of law that the deficiencies by trial counsel had a tendency to affect [any] result under the standards set forth not only by Strickland, but by Green v. Franke.
>
> So with some reluctance, because this case bothers me – I didn't – and I'm very serious this is one of the toughest cases I've had, and I've had hundreds. I really think trial counsel should have done a better job for this gentleman.
>
> But can I find that he prejudiced him to the point where he's entitled to post-conviction relief? I just cannot do that and so my verdict is for the defendant. I will make the appropriate findings and the judgment.

Respondent's Exhibit 170, pp. 211-13.

### A. Applicability of AEDPA's Standard of Review

Petitioner first asserts that the AEDPA's standard of review does not apply to this Court's review of his ineffective assistance of counsel claims because the PCR judge, by his own estimation, read only 90 percent of the trial transcript. The applicability of the AEDPA's strict standard of review is governed by whether a state court adjudicated Petitioner's claims on the merits, not on the depth of its review of the case file. When a state court has not passed upon the merits of a claim that a habeas petitioner properly raises in federal court, the claim is reviewed *de novo*. *Cone v. Bell*, 556 U.S. 449 (2009). However, when, as here, a state court has addressed the merits of a claim, the AEDPA deferential standard of review applies. *Kernan v. Hinojosa,* 578 U.S. 412, 413 (2016) (per curiam); *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004).

Petitioner also argues that the PCR judge's failure to read every page of the trial transcript compels the conclusion that he unreasonably applied *Strickland* because that case

obligated him to consider the issue of prejudice in light of the totality of the evidence adduced at trial as well as the evidence counsel should have presented. *See Strickland,* 466 U.S. at 695. The fact that the PCR judge did not personally read every page of the trial transcript does not compel the conclusion that he did not consider the totality of the evidence. The Supreme Court has never impose such a requirement when evaluating *Strickland* claims. Moreover, contrary to constituting a statement that he had not considered the totality of the evidence, this Court views the PCR judge's statement that he had personally read the vast majority of the trial transcript as a reflection of the time and attention he personally devoted to Petitioner's case. Under Petitioner's construction, the Court would have to interpret the PCR judge as stating on the record that although this case was particularly difficult and troubling, he was also refusing to consider the totality of the evidence. This is a nonsensical interpretation.

It was within the PCR judge's discretion to closely examine the portions of the transcript he felt were most relevant to the issues Petitioner presented. In this respect, the PCR judge did not unreasonably apply *Strickland* when he performed a targeted review of the record. Accordingly, this Court will apply the AEDPA's standard of review. Where the PCR court denied Petitioner's ineffective assistance of counsel claims based upon an insufficient showing of prejudice, this Court begins its analysis with that same inquiry.

  B.  <u>Analysis</u>

During his PCR action, Petitioner provided evidence from multiple expert witnesses, two of whom are at issue in this habeas corpus case.[7] Timothy Charpenter, a military training expert,

---

[7] Despite presenting evidence from numerous experts during his PCR hearing, during his PCR appeal he winnowed his claims down to those involving only Charpenter and Bedard. Respondent's Exhibits 173 & 175. As a result, how other expert testimony might have impacted his trial is not preserved for habeas corpus review. *See Rose v. Lundy*, 455 U.S. 509, 519 (1982) (only claims fairly presented to a state's highest court are eligible for habeas corpus consideration).

reviewed Petitioner's records and stated that the military had instructed him in rifle marksmanship and that his training was intended to not only teach a particular skill, but also to desensitize him to the use of force. He stated that Whitcraft's actions constituted an ambush of opportunity by: (1) suddenly stopping his vehicle; (2) reversing the vehicle so as to seal off Petitioner's immediate routes of escape and gain an advantage; and (3) immediately opening his door, prepared to exploit the kill zone he had created with a drawn and cocked pistol. Respondent's Exhibit 142, p. 5. He further provided that the military conditions its soldiers to react to such ambush situations "quickly and aggressively with lethal force," and that Petitioner's combat experiences as an aerial door gunner in Vietnam reinforced that training. *Id* at 5-6. It was his opinion that Petitioner reacted to Whitcraft's purported threat in accordance with his training. *Id* at 6-7.

Petitioner also introduced evidence from Roy R. Bedard, an expert in defensive tactics and use of force. He stated that, assuming Petitioner's version of events was true, it was reasonable to assume that his life was in danger and he had to be entirely self-reliant in his own defense. Respondent's Exhibit 137, pp. 14-15. He found that all of the physical evidence supported Petitioner's statements, found no reason to dispute the credibility or reliability of his version of events, and concluded that Petitioner's actions were consistent with accepted standards of appropriate self-defense.[8] *Id* at 28, 39.

Petitioner argues that the testimony of these two individuals (or similar experts) would have been particularly important to provide context to his reaction to the threat Whitcraft posed. He claims that the expert testimony would have made it clear that the position of his Ford

---

[8] Although Bedard also rendered an opinion on "critical incident amnesia," the PCR court did consider that portion of Bedard's Declaration because he was not qualified to render an opinion on that subject. Respondent's Exhibit 170, p. 22.

Bronco rendered implausible the State's theory that Petitioner controlled the encounter and shot from outside his vehicle. He contends that although there were multiple eyewitness accounts to Petitioner's frequent practice of jumping from his vehicle and firing his weapon, Charpenter might have explained at trial that Petitioner had a desire to keep up with his training and not lose a perishable skill.[9]

As Petitioner states, this Court must imagine the trial as if the jury had heard the testimony from both Charpenter and Bedard. However, it must also view the PCR court's decision through the deferential lens of the AEDPA which reserves habeas corpus relief only for unreasonable decisions by the state courts. Here, any testimony by Charpenter or Bedard would have been of somewhat limited value because their opinions assume the veracity of Petitioner's version of events to establish Whitcraft as the aggressor. *See, e.g.*, Respondent's Exhibit 137, p. 14 ("Assuming Sandoval's version of events . . .").

Even if this were not the case, the PCR court correctly stated that there was strong evidence of Petitioner's guilt adduced at trial.[10] Despite the fact that Whitcraft prevailed against Petitioner in the physical altercation at the Lil Pantry and had stated to at least one person that he would like to kill Petitioner, the testimony at trial generally portrayed Petitioner as the historic aggressor against Whitcraft. The witnesses testified that Petitioner was angry about losing Carlson, stalked and terrorized Whitcraft and Carlson for years, and threatened them through words and actions (including with a firearm). Two of Petitioner's former girlfriends (Rose and Garten) and another individual whom he had just met (Sell) all testified that Petitioner personally

---

[9] Charpenter testified at the PCR hearing only that a person who wishes to keep military training can do so through practice to ensure muscle memory, not that Petitioner had done so. Respondent's Exhibit 170, p. 176.

[10] Petitioner also contends that the PCR court's implicit finding that Petitioner was not credible is so clearly incorrect as to constitute an unreasonable determination of the facts. As is evident in this Opinion, there was ample evidence of Petitioner's guilt such that the PCR judge's implicit determination on his credibility was not unreasonable.

18 – OPINION AND ORDER

told them he would like to kill Whitcraft. According to Rose, Petitioner told her he had a plan to prompt Carlson or Whitcraft to brandish a firearm so he could shoot them and claim self-defense. Petitioner's many acts of provocation are consistent with Rose's testimony.

Witnesses also testified that they saw Petitioner practice a shooting maneuver whereby he would approach his target area in his car at a high rate of speed, abruptly stop, exit his vehicle, and fire his weapon. Given the trial testimony about the position of the two vehicles and the trajectory of the bullet that killed Whitcraft, these practice ambush-style maneuvers were not dissimilar to the evidence that tended to show Petitioner exited his Bronco with a firearm and shot Whitcraft in the back of the head with a single shot before Whitcraft had a chance to exit his pickup truck. The accuracy of Petitioner's round and it's angle of impact with both the rear window of Whitcraft's truck as well as his head belie Petitioner's statements to Rylander that he simply fired a lucky, right-handed shot from his driver's seat without ever having exited his vehicle, and also without the benefit of aim or even the chance to look down the barrel of his rifle. The fact that, decades earlier, the military had trained him for combat in Vietnam and that he had served in combat during that conflict would not have been particularly significant to explain such incredible accuracy.

In addition to the physical evidence derived from the scene of the killing, Petitioner's inconsistent statements were also damaging to the defense. He first told Detective Rylander that he shot Whitcraft only after Whitcraft had exited his pickup truck, turned toward Petitioner, and pointed his revolver at him. However, unprompted, Petitioner changed his recollection of events 80 minutes later to more closely align his version of the shooting to fit the physical evidence at the scene. He likely realized that if he did not alter his first statement, it would be impossible for him to explain: (1) how Whitcraft stepped outside his truck with one leg yet had both of his feet

19 – OPINION AND ORDER

tangled in speaker wire in his truck's interior when he was killed; and (2) how he shot Whitcraft in the back of the head through the truck's rear window if Whitcraft had exited his truck with one leg, was facing him, and pointing a gun at him.[11]

The jury in this case made a credibility determination adverse to Petitioner based upon strong circumstantial evidence that he shot Whitcraft in the back of his head as he sat in his truck. The production of Petitioner's military records and resulting expert testimony from Charpenter and Bedard during Petitioner's PCR proceedings are not so strong as to establish a reasonable probability that, but for counsel's errors, the result of the trial would have been different. At a minimum, this Court cannot conclude that the PCR judge's prejudice determination was not only wrong, but so unreasonable that no fairminded jurist could agree with his conclusion. Habeas corpus relief is therefore denied.

## CONCLUSION

For the reasons identified above, the Amended Petition for Writ of Habeas Corpus (#23) is denied. The Court does, however, issue a Certificate of Appealability limited to Grounds I, III(A), III(B)(b), and III(B)(d) of the Amended Petition.

IT IS SO ORDERED.

March 20, 2023
DATE

Michael H. Simon
United States District Judge

---

[11] Petitioner argues that Bedard could have explained inconsistencies in Petitioner's statements to Detective Rylander in the aftermath of the shooting by opining that individuals can make unintentional misstatements in the immediate aftermath of a violent confrontation. However, this is the "critical incident amnesia" opinion that the PCR court excluded. Respondent's Exhibit 170, p. 22. Accordingly, it is not properly before this Court for its consideration. Even if the Court could consider Bedard's opinion on this matter, his testimony that witnesses can make misstatements in the aftermath of violent encounters would not have meaningfully negated the damaging effects of Petitioner's shifting account.